

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| AAS:JEA | *271 Cadman Plaza East* |
| F. # 20R00196 | *Brooklyn, New York 11201* |

August 31, 2022

By ECF

Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Ashiqul Alam
         Criminal Docket No. 19-280 (LDH)

Dear Judge DeArcy Hall:

The government respectfully submits this letter regarding sentencing of the defendant Ashiqul Alam, scheduled for September 16, 2022.  On December 17, 2021, the defendant pleaded guilty pursuant to a plea agreement with the government under Federal Rule of Criminal Procedure 11(c)(1)(C), to possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B).  Presentence Investigation Report ("PSR" ¶ 1)

For the reasons discussed herein, the government respectfully submits that the agreed-upon sentence of 60 months' imprisonment and supervised release term of three years is appropriate in this case, and that – as agreed by the defendant in his plea agreement – the Court should enter a judicial order of removal pursuant to Title 8, United States Code, Sections 1228(c)(5) and 1227.[1]

I.     Background

From April 2018 through his arrest in June 2019, the defendant spoke approvingly about various terrorist attacks, including the September 11th terrorist attacks.  In addition, the defendant made a number of statements of admiration to various terrorist organizations, including the Islamic State of Iraq and al-Sham ("ISIS").  During his meetings with undercover law enforcement officers ("UCs"), the defendant also repeatedly expressed

---

[1] The government will provide the Court with the judicial order of removal at the time of sentencing.

interest in purchasing firearms and explosives for use in a terrorist attack in the New York City area.  Pursuant to the plea agreement, Alam has stipulated to a set of facts that describe his conduct in greater detail (the "Stipulated Facts").  The Stipulated Facts, which are attached to the plea agreement, are also attached hereto as Attachment A and incorporated by reference.  Many of the key facts of Alam's conduct are discussed below.

A.    The Investigation and Defendant's Offense Conduct

The PSR and Stipulated Facts accurately describe the offense conduct in this case.  See Stipulated Facts; PSR ¶¶ 3-25.  In April 2018, the defendant met with an undercover law enforcement officer ("UC-0") and discussed his interest in gun ownership and signing up for the U.S. Army Reserves or National Guard.  During the conversation, the defendant stated: "As I was telling you I'm just gonna turn on my own men (Laughing)."  The defendant also discussed placing bombs on a military base and blowing it up.

Later that year, on or about August 5, 2018, the defendant met with UC-0 and stated that he wanted "Muslims" to build a "Khalifa[h], a strong Islamic State."  A few weeks later, the defendant discussed UC-0's purported impending travel to Pakistan, and stated that, if UC-0 joined "the dawlah," then the defendant would have "a direct connection" and that "maybe it'll be easier for me to go down there, you know."  The defendant thereafter met with another undercover law enforcement officer ("UC-1").  After UC-1 asked the defendant what his dream was, he replied, "I want to put the flag of the Khalifah on the Empire State Building" and said that he would die for New York City to be "our capitol in the East."

On or about September 11, 2018, the defendant met with UC-1.  During their meeting, the defendant discussed deceased al-Qaeda leader Usama Bin Laden and the terrorist attacks in the United States on September 11, 2001.  In response to questions by UC-1 about whether Bin Laden was successful in his mission, the defendant stated that Bin Laden's "mission is a complete success, thousands of American soldiers died and trillions of their monies gone in the war."  In response to UC-1's question if Bin Laden was successful in establishing a Khalifah, the defendant stated that "it was the duty of Muslims, you know, to make the khalifa."  He also said that Bin Laden "did his job[.]  He did what he is supposed to do.  Now it's up to us."

A few weeks later, the defendant and UC-1 met and discussed the use of suicide vests.  The defendant stated that they had "two options" to use the suicide vest, either in an attack in New York City in Times Square during a big festival, or in an attack in Washington, D.C., to kill then-President Donald J. Trump.

In early December 2018, the defendant met with UC-1 and discussed carrying out an attack in New York City.  When UC-1 asked the defendant what types of resources were needed, the defendant stated that they needed to obtain bomb-making materials, including means to detonate a suicide vest.  The defendant also said that they would need "little circles, balls and . . . when it blows up those balls explode and the metal sprays everywhere.  The more better the explosives, the more farther the shrapnel could go."  Later in the meeting, when UC-

1 asked what the defendant would do with a big gun if he had one, the defendant replied that he would use it to shoot at police officers "if they come at us."

In early January 2019, the defendant and UC-1 conducted reconnaissance of Times Square.  During their recon, the defendant stated that he was looking for potential targets and that they "would have to become ready.  Like in a war, you know.  You make the plans, you do the recon."  Later that month, the defendant again went with UC-1 to do another "recon" of Times Square and pointed to an area within Times Square where there were crowds of people, and stated, "[M]ost of the people are there you know, it makes more impact."

On or about January 16, 2019, the defendant and UC-1 traveled to a shooting range in Pennsylvania.  While driving to the range, the defendant stated, "I want to die fighting man" and indicated that he wanted to die fighting for ISIS.  While driving home from the range, the defendant and UC-1 discussed purchasing firearms.  The defendant stated that making such a purchase was a huge risk, but not a bad idea if they could avoid being arrested.

A few months later, the defendant continued to promote his support for conducting a terrorist attack in New York City.  On or about March 14, 2019, the defendant suggested using a rocket launcher to attack the World Trade Center and when asked how he could conduct attack with the tools that were available, the defendant replied, "[P]robably a bomb."  A week later, when asked what would make him happy, the defendant replied, "[S]eeing the flag of Islam on the Twin Towers or the Empire State Building."

On or about April 11, 2019, the defendant met with UC-1 and discussed purchasing firearms from an "associate" of UC-1.  During that meeting, UC-1 called the "associate," who was another undercover officer ("UC-2") purporting to be a firearms dealer, on a speaker phone as the defendant listened.  During the call, UC-2 agreed to meet with the defendant and UC-1 to discuss a firearms purchase.  Later that same day, the defendant and UC-1 met with UC-2.  During the meeting, the defendant told UC-2 that he wanted to buy two Glock G19 semi-automatic pistols.  The defendant also discussed his concerns about the firearms being traced back to him and whether the guns were bought "legally or from the streets," and UC-2 explained that the guns were obtained illegally.  The defendant later repeated that he wanted to purchase two Glock G19 semi-automatic pistols and that he was prepared to pay $2,000 total for both.

On or about April 25, 2019, the defendant and UC-1 traveled to a shooting range in Pennsylvania.  While driving to the range, the defendant told UC-1 that he had an upcoming Lasik eye surgery appointment and asked for help driving to and from the appointment.  When UC-1 asked why he was taking the risk, the defendant replied: "Let's say we are in an attack, right, say that my glasses fall off.  What if I accidentally shoot you?  You know what I mean.  Imagine what the news channel would call me [laughing] the 'Looney Tunes Terrorist' who killed his own man [laughing] or the 'Blind Terrorist' [laughing]."  UC-1 then asked whether they would use a "gun" during an attack, to which the defendant stated that he would potentially use a gun after first throwing the "bombs," referring to grenades.

In early May 2019, the defendant met with UC-1 and discussed purchasing the firearms from UC-2's associate, a third undercover officer ("UC-3"). During the meeting, UC-1 said that UC-2 had reported that UC-3 was "going to get us stuff with the serial numbers scratched off." The defendant responded, "Oh, that's good, man."

On or about May 9, 2019, the defendant met with UC-1 at UC-1's apartment in Brooklyn. While waiting on the arrival of UC-2, the defendant told UC-1 that he hoped the police did not come through the front door of the apartment. After UC-2 and UC-3 arrived at the apartment, UC-2 opened a suitcase containing firearms, including handguns and an Avtomat Kalashnikova ("AK-47") assault rifle, as well as hand grenades. UC-2 and UC-3 explained that all the firearms had their serial numbers scratched off. The defendant asked if he could hold the Glock G19 semi-automatic pistol that UC-2 and UC-3 had brought with them. The defendant further inquired about the AK-47 and asked UC-3 whether it was a fully automatic rifle; UC-3 confirmed that the AK-47 was fully automatic. Further, the defendant, after observing the grenades, stated that they "look like Russian-made grenades."

After UC-2 and UC-3 left the apartment, the defendant stated, "Damn man, he's rocking an AK" and asked UC-1 if UC-1 wanted an AK-47. The defendant told UC-1 that they should buy only one AK-47, because buying two of them would be too expensive. Later in the conversation, UC-1 asked the defendant how he would use the AK-47. The defendant explained that the AK-47 could be useful as part of a suicide vest attack and that grenades could do significant damage and could "take out at least eight people" if it were to explode indoors, such as in a mall, or in a large gathering. At the end of the conversation, the defendant told UC-1 that he first wanted to buy the two Glock pistols. The defendant further stated, "Damn bro, I'm happy." UC-1 asked, "Why?" The defendant responded, "You know . . . the guns . . . progress."

On or about May 29, 2019, the defendant met with UC-1. During that meeting, the defendant informed UC-1 that, after they purchased the two Glock pistols, he wanted to buy a grenade. On or about June 6, 2019, the defendant and UC-1 met and traveled to UC-1's apartment in Brooklyn. While traveling to UC-1's apartment, the defendant told UC-1 that he wanted to obtain a New York State enhanced driver license. When asked to elaborate, the defendant stated that an enhanced driver license would allow him to "walk on to a military base" to "blow it up."

After arriving at UC-1's apartment, the defendant and UC-1 met UC-2 and UC-3. During that meeting, UC-3 told the defendant and UC-1 that the price for each of the Glock 19 pistols was $400 and that UC-3 included a box of ammunition for free. The defendant responded, "[T]hanks a lot for the ammo" and asked UC-3 about the model of the Glock 19 pistols. UC-2 then showed the defendant and UC-1 that each of the firearms had the serial numbers scratched off. The defendant and UC-1 then each paid $400 to UC-3 for the two Glock 19 pistols. The defendant provided $400 towards the purchase, all in $100 bills. Shortly thereafter, the defendant asked UC-3 whether he could buy a silencer. After the defendant and UC-1 each took possession of the Glock 19 pistols with obliterated serial numbers, the defendant was placed under arrest.

B.      Procedural History

On June 20, 2019, a grand jury in the Eastern District of New York returned an indictment charging the defendant with one count of possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B).

On December 17, 2021, the defendant pleaded guilty to the sole count of the indictment, pursuant to a plea agreement in accordance with Federal Rule of Criminal Procedure 11(c)(1)(C), with an agreed-upon sentence of 60 months' imprisonment, three years supervised release, and his consent to entry of a judicial order of removal from the United States.  See Plea Agreement ¶¶ 2, 13-19 (Dec. 17, 2021).

II.     The Sentencing Scheme and the Guidelines Calculation

The count of conviction carries a sentencing range of up to 5 years' imprisonment, the statutory maximum sentence.  As set forth below, as the Probation Department concluded in the PSR, and as the defendant stipulated in the plea agreement, the Guidelines calculation yields an advisory Guidelines sentence of 5 years' imprisonment, which is the statutory maximum for the offense.

A.      The Guidelines Calculation

The PSR's total offense level of 29 is premised upon a base offense level of 12 (U.S.S.G. § 2K2.1(a)(7)), a four-level enhancement because the firearm had an obliterated serial number (U.S.S.G. § 2K2.1(b)(4)(B)), and a 12-level enhancement because the offense involved or was intended to promote a federal crime of terrorism (U.S.S.G. § 3A1.4). Because the resulting offense level is 28, the offense level is increased to level 32, pursuant to U.S.S.G. § 3A1.4.  PSR ¶ 32.  The PSR correctly concludes that, decreasing three levels for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a)-(b), the applicable Guidelines level as to the defendant is 29.  PSR ¶¶ 29-39.  The defendant stipulated to this Guidelines calculation in the plea agreement.  See Plea Agreement ¶ 2 (Dec. 17, 2021).

The defendant's Criminal History category is VI because the offense involved, or was intended to promote, a federal crime of terrorism.  See U.S.S.G. § 3A1.4(b).[2]  With a total offense level of 29 and a Criminal History category of VI, the resulting Guidelines range is 151 to 188 months' imprisonment.  However, because the statutory maximum sentence is 60 months, the effective Guidelines range is 60 months' imprisonment.  PSR ¶ 69.

---

[2] The PSR correctly applies the terrorism enhancement to the defendant's total offense level but not to the defendant's criminal history category.  See U.S.S.G. § 3A1.4(b); PSR ¶¶ 43, 69.  As a result, the government requests that Probation amend the PSR so that it correctly notes the defendant's criminal history category of VI.

III.     The Court Should Sentence the Defendant to 60 Months of Imprisonment

The government respectfully submits that a sentence of 60 months of imprisonment and a supervised release term of three years is sufficient, but not greater than necessary, to reflect the purposes of sentencing.

A.     Legal Standard

Rule 11(c)(3)(A) of the Federal Rules of Criminal Procedure provides that, if presented with a plea agreement pursuant to Rule 11(c)(1)(C), "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Section 6B1.2(c) of the Guidelines sets forth the standard for acceptance of a Rule 11(c)(1)(C) plea agreement. As relevant here, Section 6B1.2(c) provides that "the court may accept the agreement if the court is satisfied either that: (1) the agreed sentence is within the applicable guideline range; or (2)(A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form." Whether to accept a plea agreement rests within the Court's discretion. See United States v. Severino, 800 F.2d 42, 45 (2d Cir. 1986); United States v. Torres-Echavarria, 129 F.3d 692, 696 (2d Cir. 1997). However, "[d]eference ought to be paid to sentencing bargains because prosecutors are in the best position to make decisions about what sentence to pursue in plea negotiations." United States v. Espar, Inc., 15-CR-28 (JG), 2015 U.S. Dist. LEXIS 30469, at *2 (E.D.N.Y. Mar. 10, 2015).

B.     60 Months of Imprisonment Is the Appropriate Sentence

The Court should accept the parties' Rule 11(c)(1)(C) plea agreement and impose the proposed sentence of 60 months of imprisonment and three years' supervised release. The government respectfully submits that the proposed sentence appropriately addresses each of the Section 3553(a) factors, including the nature and circumstances of the offense and the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.

The agreed-upon sentence appropriately balances the seriousness of the defendant's conduct and the need to ensure that the defendant does not engage in further terrorist activity against the benefits of a negotiated resolution, and it permits careful allocation of prosecutorial and other governmental resources, which would otherwise be devoted to extensive pretrial and trial litigation.

The agreed-upon sentence reflects the seriousness of the defendant's conduct in purchasing a firearm with an obliterated serial number which he intended to use in his plans to conduct a terrorist attack in New York City, specifically Times Square. Indeed, as reflected in the Stipulated Facts, the defendant demonstrated a commitment to promoting and waging violent jihad, both in his words and his actions, making specific deterrence and the

6

need to protect the public important factors requiring the agreed-upon sentence.  The defendant stated to UC-1 that the purchase of the firearms was part of his "plan" in conducting a terrorist attack in Times Square.  Thus, the defendant's conduct was extremely serious, and the agreed-upon sentence reflects the seriousness of that conduct.

Additionally, the proposed sentence is sufficient but not greater than necessary to deter such conduct in the future by making unambiguously clear that those that purchase firearms illegally and with the intent to evade detection will result in a substantial period of incarceration.  Given the gravity of the offense and the potential catastrophic damage that might have occurred had the defendant achieved his aim of conducting a terrorist attack against innocent civilians in Times Square, this Court should make clear to anyone contemplating similar actions that such an offense will be punished severely.

The sentence will also specifically deter this defendant from terrorism activity in the future and will result in his removal from the United States once he has served his sentence.  Indeed, the sentence and judicial order of removal will ensure that the defendant poses no future danger to the public here in the United States.

For those reasons, the government respectfully submits that the proposed resolution adequately holds the defendant responsible for his conduct and is an appropriate exercise of prosecutorial discretion.  Courts have long recognized the interests described herein as appropriate bases for the exercise of prosecutorial discretion:

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.  Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.  Judicial supervision in this area, moreover, entails systemic costs of particular concern.

Wayte v. United States, 470 U.S. 598, 607 (1985).

Accordingly, the government respectfully submits that the Court should accept the defendant's Rule 11(c)(1)(C) plea and, consistent with that agreement, impose a sentence of 60 months of imprisonment, to be followed by three years supervised release, and enter the judicial order of removal to be submitted by the government at the time of sentencing.

IV.    Conclusion

        For the foregoing reasons, the government respectfully submits that the agreed-upon sentence of 60 months of imprisonment pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) is appropriate in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/_____
Jonathan E. Algor
Assistant U.S. Attorney
(718) 254-6248

cc:    Morris J. Fodeman, Esq. (by ECF)
      USPO Jameka Bing (by email)